**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**NORTHERN DIVISION**

| | | |
|---|---|---|
| **THERESA L. MYERS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **No. 2:18CV107 PLC** |
| | ) | |
| **ANDREW SAUL,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM AND ORDER

Plaintiff Theresa Myers seeks review of the decision by the Commissioner of Social Security Andrew Saul[1], denying her application for Disability Insurance Benefits (DIB) under the Social Security Act (Act).  Because the Court finds that substantial evidence supports the decision to deny benefits, the Court affirms the denial of Plaintiff's application.

### I. Background & Procedural History

In February 2015, Plaintiff, then sixty years old, filed an application for Disability Insurance Benefits alleging that she was disabled as of September 20, 2014 due to:  "compression fractures C-1 through T-1, degenerative bone disease, thyroid, high cholesterol, depression, anxiety attacks." (Tr. 104)  The Social Security Administration (SSA) denied Plaintiff's claims, and she filed a timely request for a hearing before an administrative law judge (ALJ). (Tr. 134-38, 141-42)  After the ALJ issued a decision in October 2016 finding Plaintiff not disabled, Plaintiff appealed to the SSA Appeals Council, which remanded the case to the ALJ for "further evaluation" of the opinion of Plaintiff's treating physician, Dr. Sparks.  (Tr. 129-33)

---

[1] At the time this case was filed Nancy A. Berryhill was the Deputy Commissioner of Social Security.

The ALJ conducted a second hearing in February 2018.  (Tr. 32-70)  On remand, the ALJ applied the five-step evaluation set forth in 20 C.F.R. § 404.1520(a) and issued a decision dated May 4, 2018, concluding that Plaintiff "has not been under a disability within the meaning of the Act from September 20, 2014, through the date of this decision." (Tr. 16)  Plaintiff filed a request for review of the ALJ's decision with the SSA Appeals Council, which denied the request. (Tr. 1–6) Plaintiff has exhausted all administrative remedies, and the ALJ's decision stands as the Commissioner's final decision.  Sims v. Apfel, 530 U.S. 103, 106–07 (2000).

**II. Evidence before the ALJ**

A.  Testimony

Plaintiff testified that she was sixty-three years old and had previously worked as the executive director of Rural Advocates for Independent Living.  (Tr. 37)  In that position, she supervised up to twenty-seven staff members, wrote grants, reviewed "consumers' files," attended board meeting, and communicated with other agencies. (Id.)  Plaintiff stated that she stopped working in May 2014 because she was terminated for "[l]arge amounts of absenteeism … I would say two to three days a week sometimes, or I would call in late because the pain was too severe to be able to function."  (Tr. 38)

Plaintiff testified that she had compression fractures in her spine from C3 to T1.  (Tr. 39) Plaintiff explained that the pain "starts at the base of my neck and runs down to the middle of my shoulder blades, and a lot of times … my arms will burn from the inside out.  I have no feeling in my hands."  (Tr. 39)  Plaintiff explained that the "mobility issues" in her arms had been "going on for a great number of years, but it's been getting progressively worse[.]"  (Id.)

Plaintiff affirmed that, in 2011, she underwent a "hemilaminectomy and deconstruction by thermal ablation on the right" at C4-5.  (Tr. 51)  Plaintiff testified that the surgery did not alleviate

any of her symptoms.  (Tr. 52)  Plaintiff had seen several specialists to discuss further surgical

options, but "they wanted [ ] to put a steel rod in [her] neck that runs from C3 to T1," to "fuse all

of those vertebra[e]…with no guarantee that it will stop the pain or that [she] would regain any of

the numbness or mobility."  (Tr. 42)  Plaintiff was hesitant to proceed with such a surgery because

"the steel rods will continue to apply pressure to the rest of the spine, leading [the] degeneration

to expand" and she feared losing more mobility.  (Id.)  Plaintiff managed her pain by alternating

hot and cold presses and taking hydrocodone.  (Tr. 53)  She denied side effects from her

medications.  (Id.)

Plaintiff did not shower unless her husband was home and did not wash her hair more than

once a week because "it hurts to raise my hands up over my head."  (Tr. 45)  In regard to household

chores, Plaintiff stated "[we] use a lot of paper plates because my ability to do dishes has

decreased" and "I drop things all the time."  (Tr. 43)  Plaintiff elaborated that "[c]ooking has

always been one of my loves, but I find that with my [limited] mobility and the pain, I no longer

get to enjoy that."  (Id.)  Plaintiff stated that her daughter helped her with vacuuming, dusting,

laundry, and shopping.  (Id.)  She avoided driving because "you're supposed to have both … hands

on the wheel.  I cannot do that.  They go numb and the pain becomes excruciating."  (Tr. 49)

Plaintiff could no longer  open bottles, type, or "hold a pen for any long period of time."  (Tr. 57-

58)

Plaintiff attributed her depression to her "disability because I'm not the person I used to

be.  I can't do the things I used to do…."  (Tr. 46)  Plaintiff explained that the depression "is

uncontrollable, wanting to just cry, and I feel worthless."  (Tr. 47)  Plaintiff cried "at least once a

day" due to pain and frustration.  (Tr. 56)  In regard to her anxiety, Plaintiff testified that she often

experienced anxiety attacks "in the middle of the night where I feel like the world is caving in on

me.  I can't breath.  I can't sleep …. I have heart palpitations, cold sweats, or chills."  (Tr. 47)
Plaintiff had difficulty sleeping because she awoke "about every hour in pain."  (Tr. 56)

A vocational expert also testified at the hearing. (Tr. 60) The ALJ asked the vocational
expert to consider a hypothetical individual with Plaintiff's age, education, past work experience,
and the ability to perform sedentary work with the following limitations:

> They could frequently reach overhead and in all directions with both the
> right and left arm. They could frequently handle and finger with the left and
> right hand. They should never climb ladders, ropes, or scaffolds. They could
> less-than occasionally crawl. They should never work at unprotected
> heights or around moving mechanical parts. They should never work in
> vibration.

(Tr. 64)  The vocational expert stated that such person could perform Plaintiff's past work as a
social welfare administrator.  (Id.)

When the ALJ modified the hypothetical such that the individual could only "occasionally
reach,…both overhead and in all directions, with both left and right arms; and only occasionally
hand[le] and finger[] with the left and right hand; and never […] crawl," the vocational expert
stated that the individual would still be able to perform Plaintiff's past work.  (Tr. 64)  However,
if the hypothetical further limited the individual to simple, routine tasks and simple work-related
decisions, the hypothetical individual would not be able to perform Plaintiff's past work.  (Tr. 64-
65)  The vocational expert also opined that a limitation to less than occasional bilateral handling
or fingering would preclude employment because "[a]ny job I can think of in the sedentary job
base would require a good bilateral use of the upper extremities."  (Tr. 67-68)

B.  Medical Records

The earliest medical record from Plaintiff's primary care physician Dr. Sparks was dated
May 2011.  (Tr. 468)  Dr. Sparks noted he was treating Plaintiff for hypothyroidism,
hyperlipidemia, chronic pain, anxiety, and major depressive disorder, and he prescribed Lasix,

Mevacor, Prozac, Synthroid, Vicodin, and Xanax.  (Tr. 468, 470)  The record reflects that Dr. Sparks saw Plaintiff eleven times in 2011. (Tr. 385)

In December 2011, an MRI of Plaintiff's cervical spine revealed "significant cervical spine stenosis at C4/C5, C5/C6, and C6/C7."  (Tr. 374)  Dr. Flood at the Laser Spine Institute informed Plaintiff that the standard of care for such significant stenosis was a cervical full bilateral decompression with reconstruction, which would include fusion and instrumentation. (Id.) Plaintiff decided against any spinal fusion and requested a minimally invasive alternative.  (Id.) Dr. Flood subsequently performed a "deconstruction by thermal ablation of the paravertebral facet joint nerves, right C4/C5" and a "left C4 hemilaminectomy."  (Tr. 375)

Between January 2012 and February 2013, Plaintiff saw Dr. Sparks nine times and regularly complained of low energy and poor sleep.  (Tr. 384, 427, 430, 434, 438)  On examination in December 2012, Dr. Sparks noted that Plaintiff had normal posture, gait, sensation, coordination and deep tendon reflexes in her upper and lower extremities.  (Tr.428)  Later that month, Plaintiff described "stabbing and shooting" pain in the mid-cervical spine.  (Tr. 424)  In February 2013, Dr. Sparks switched Plaintiff from Vicodin to hydrocodone-acetaminophen.  (Tr. 422)

Between March 2013 and March 2014, Dr. Sparks saw Plaintiff eight times. (Tr. 384)  In June 2013, Plaintiff informed Dr. Sparks that she "felt well with no complaints" and had "good energy" but was sleeping poorly.  (Tr. 412)  On examination in June and December 2013, Dr. Sparks observed that Plaintiff was alert and oriented with no memory impairments, had normal sensation and coordination, and had intact upper and lower extremity reflexes.  (Tr. 413, 408)  In Marh 2014, after several visits at which Plaintiff expressed no real changes in her pain, Dr. Sparks decreased Plaintiff's dosage of hydrocodone-acetaminophen.  (Tr. 403)

Plaintiff presented to Dr. Sparks seven times between May 2014 and August 2015.  (Tr. 384, 491, 496)  In February 2015, Plaintiff complained that her pain was "worse than it had been in a long time" and rated it a 10/10.  (Tr. 386)  Additionally, Plaintiff reported that the "numbness seemed to be progressing" and she was still sleeping poorly.  (Id.)  On examination, Dr. Sparks found that Plaintiff had:  no memory impairment; normal attention span and ability to concentrate; normal sensation and coordination; and normal deep tendon flexes in all extremities.  (Tr. 388)

In May 2015, Plaintiff informed Dr. Sparks that she did not feel well and her pain remained at 10/10. (Tr. 491)  Dr. Sparks noted that Plaintiff had decreased grip strength and sensation in both hands, a burning sensation in both hands and arms, and her weight was down sixteen pounds due to lack of appetite.  (Id.)  Plaintiff was alert, oriented, and well-groomed and her posture and gait were normal.  (Tr. 494)  Dr. Sparks increased Plaintiff's hydrocodone-acetaminophen. (Tr. 495)  When Plaintiff returned to Dr. Sparks' office in August 2015, her grip strength had not improved and she "seem[ed] very depressed."  (Tr. 496)

In September 2015, Dr. Sparks ordered another MRI of Plaintiff's cervical spine, which revealed severe degenerative disc disease with "posterior endplate osteophyte and/or bulging…moderate at C4-5 through C6-7…and loss of disc height [] moderate at C4-5, and severe at C5-6 [and] C6-7."  (Tr. 476)  The MRI also revealed:  "facet arthritic change severe at C3-4…[and] severe at C4-5 [] allowing moderate degenerative anterolisthesis"; "[c]entral canal spinal stenosis" severe at C3-4 through C5-6 and "almost severe" at C6-7"; and "neuroforaminal spinal stenosis" to be and "severe, bilaterally" at C4-5 and moderate at C3-4, C5-6, and C6-7. (Id.)

In October 2015, Dr. Harden completed a psychiatric evaluation of Plaintiff and diagnosed her with PTSD and major depressive disorder.  (Tr. 478-80)  On examination, Dr. Harden observed that Plaintiff had "good grooming" and "maintained appropriate interactive eye contact" and "a

well-modulated affect," but showed "paucity of spontaneous movement" while seated, "slow, cautious gait," and "somewhat rigid, upright" posture.  (Tr. 479)  Dr. Harden noted that, "despite her use of multiple psychiatric medications [including Prozac and Xanax] … she continues to have active, ongoing symptoms of major depressive disorder and posttraumatic stress disorder."  (Tr. 480)  Dr. Harden "strongly encouraged" Plaintiff "to consider the pursuit of mental health treatment involving psychotherapy and prescription medications with a mental health professional."  (Id.)

At her appointment with Dr. Sparks in December 2015, Plaintiff reported that her grip strength and sensation had not improved and she "hurts and doesn't feel good."  (Tr. 501)  Dr. Sparks observed that Plaintiff "seems very depressed" and had lost another ten pounds due to lack of appetite.  (Id.)  Plaintiff reported that she was still unable to find a job and believed this was due to her age. (Id.)  Dr. Sparks observed that Plaintiff was alert, oriented, and well-groomed.  (Tr. 503)  She had normal posture and gait, no memory impairment, normal attention span, and normal sensation, coordination, and deep tendon reflexes.  (Tr. 503-04)

In February 2016, Dr. Sparks referred Plaintiff to Dr. Bondurant for a neurosurgical consultative examination.  (Tr. 482-89)  On examination, Dr. Bondurant observed that Plaintiff "moves about the office with fair ease" and her upper and lower extremity strength was 5/5 with "some giveaway weakness which clears with encouragement."  (Tr. 485-86)  Dr. Bondurant noted "[s]ensation is accurate with pinprick and fine touch challenges, save for the third, fourth, and fifth digits of the left hand" and "[p]rolonged flexion of the wrists re-creates hand paresthesia in the second, third, fourth digits of bilateral hands after approximately 30 seconds' time."    (Tr. 486)  Dr. Bondurant suggested that "peripheral neuropathic changes, to include entrapment" might be underlying her upper extremity problems and suggested electrophysiologic studies of the upper

extremities.  (Tr. 487-88)  After discussing her options, Plaintiff opted to "stay the course with redoubled efforts with her nonoperative efforts."  (Tr. 488)

In March 2016, Dr. Sparks recorded that Plaintiff had lost another eight pounds, was "in quite a bit of pain," had decreased energy, and had stopped taking her cholesterol medicine because she "cannot afford it with all her other medications."  (Tr. 509)  Her grip strength and sensation had not improved.  (Tr. 509)  Plaintiff's physical examination was normal.  (Tr. 512-13)

In early July 2016, Plaintiff complained that she was in "quite a bit of pain today," and Dr. Sparks noted that she had lost another ten pounds. (Tr. 519) On examination, Dr. Sparks observed: normal posture and gait; alert and oriented with no memory impairment; normal attention span and ability to concentrate; normal sensation; and normal coordination and upper and lower extremity deep tendon reflexes.  (Tr. 520)  Dr. Sparks continued Plaintiff's medication and prescribed Paroxetine HCl for depression.  (Id.)

Dr. Sparks completed a physical medical source statement (MSS) for Plaintiff in July 2016. (Tr. 516-18)  Dr. Sparks stated that Plaintiff "has severe degenerative disc disease of cervical spine with numbness of hands with movement of arms," and he characterized her pain as "severe."  (Tr. 518)  Dr. Sparks estimated that Plaintiff could:  sit for less than five minutes and stand for less than five minutes at a time for a total of less than one hour in a workday; frequently lift and/or carry ten pounds during a typical workday; frequently perform fine manipulation with both hands; and occasionally perform gross manipulation with both hands.  (Tr. 516)  Dr. Sparks opined that Plaintiff would miss at least fifteen percent of the workday due to unscheduled work breaks and at least two days of work per month due to pain, fatigue, or other medical issues.  (Tr. 517)  Finally, Dr. Sparks stated that Plaintiff would have to assume reclining and supine positions one to three times per day for thirty minutes.  (Tr. 516)

In October 2016, Plaintiff complained to Dr. Sparks of dizziness, decreased energy, and poor sleep and, in January 2017, Dr. Sparks noted that Plaintiff was "having increased pain which she feels has added to her depression." (Tr. 531, 534) Dr. Sparks increased Plaintiff's Paroxetine. (Tr. 536) Physical and mental examinations at both appointments yielded normal results. (Tr. 532, 535)

In April 2017, Cheryl Patterson, M.Ed. evaluated Plaintiff using a Purdue Pegboard Test.[2] (Tr. 523) Plaintiff's "right hand trial average" was "6 standard deviations below the mean in this segment," "left hand trial average" was "7 standard deviations below the mean," and "both hands trial average" was "6 standard deviations beneath the mean in this segment of the test." (Tr. 523-24) Plaintiff was unable to complete the "right+left+both assembly test."[3] (Tr. 524) In response to interrogatory questions, Ms. Patterson stated that Plaintiff "did not show adequate manual dexterity according to the statistical charts provided in the testing manual" and was not "capable of performing well at a job requiring the use of her hands." (Id.) Ms. Patterson concluded: "Since [Plaintiff] scored so poorly, expressed intense physical discomfort and was unable to complete this brief assessment, I do not see how she can function in the workplace." (Tr. 529)

---

[2] Ms Patterson administered the Pursue Pegboard Test, Model 32020, which "involves the subject's comprehension and manual dexterity in placing pins, collars, and washers in appropriate holes." (Tr. 523)

[3] Ms. Patterson recorded the following observations:

> While [Plaintiff's] demeanor throughout the interview was very compliant, her body language expressed extreme discomfort. During the various segments of the test, [Plaintiff's] posture was rigid and her head shook as if she had a tremor. She frequently massaged and squeezed her hands, which appeared red. Her fingers visibly shook as she attempted to grasp each of the small test articles, dropping them. After saying she could not finish the final portion of the test, [Plaintiff] left the office in tears.

(Tr. 525)

In May 2017, Dr. Sparks noted that Plaintiff was experiencing "increased pain with the weather change" and, in July 2017, Plaintiff reported "numbness from the neck issues" as well as "some trouble with her hands and elbows." (Tr. 537, 539)  Plaintiff also complained of increasing dizziness, associated with loss of balance and paresthesia," which caused her to fall down the stairs and "list[] toward the left when walking[.]" (Tr. 539)  Dr. Sparks suggested a CT scan of the brain, but Plaintiff refused.  (Tr. 541)  Dr. Sparks continued to record that Plaintiff had normal posture and gait, no memory impairment, normal attention span and concentration, and normal sensation, coordination, and extremity deep tendon reflexes.  (Tr. 538)  When Plaintiff followed up with Dr. Sparks in July 2017, she again reported pain and dizziness.  (Tr. 539)  Plaintiff's physical and mental examinations were normal, and Dr. Sparks continued her medications.  (Tr. 540)

Plaintiff returned to Dr. Sparks' office in October 2017 for "chronic opioid management." (Tr. 542)  Dr. Sparks noted:  "Pain scores include a current pain level of 9/10, an average pain level of 6/10 (with pain medication) and maximum pain level of 10/10." (Tr. 542)  The pain was aching, constant, and "exacerbated by use of the extremity (has numbness in both arms)." (Tr. 542)  In January 2018, Plaintiff's pain was the same, she was "having a lot of trouble with depression," and she reported a recent fall on ice. (Tr. 545)  Dr. Sparks' examination noted normal posture and gait, no memory impairment, normal attention span and concentration, and normal sensation, coordination, and extremity deep tendon reflexes.  (Tr. 546)  Dr. Sparks prescribed methylprednisolone and continued her Xanax and Paroxetine.  (Id.)

### III. Standards for Determining Disability under the Act

Eligibility for disability benefits under the Act requires a claimant to demonstrate that he or she suffers from a physical or mental disability. 42 U.S.C. § 423(a)(1). The Act defines disability as "the inability to do any substantial gainful activity by reason of any medically determinable

physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than 12 months." 42 U.S.C. § 423(d)(1)(A); see also 20 C.F.R. § 404.1505(a). The impairment must be "of such severity that [the claimant] is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy...." 42 U.S.C. § 1382c(a)(3)(B).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. See 20 C.F.R. § 404.1520. Those steps require a Plaintiff to show that he or she: (1) is not engaged in substantial gainful activity; (2) has a severe impairment or combination of impairments which significantly limits his or her physical or mental ability to do basic work activities or (3) has an impairment which meets or exceeds one of the impairments listed in 20 C.F.R., Part 404, Subpart P, Appendix 1; (4) is unable to return to his or her past relevant work; and (5) the impairments prevent him or her from doing any other work. Id.

### IV. The ALJ's Decision

The ALJ applied the five-step evaluation process set forth in 20 C.F.R. Section 404.1520 and found that:  (1) Plaintiff had not engaged in substantial gainful activity since September 20, 2014, the alleged onset date of disability; and (2) had the severe impairment of degenerative disc disease of the cervical spine.  (Tr. 17)  Additionally, the ALJ determined that Plaintiff had the following non-severe impairments:  hypothyroidism, hyperlipidemia, bronchitis, pharyngitis, gastroenteritis, obesity, depression, anxiety, panic attacks, and PTSD.  (Tr. 18)  At step three, the ALJ concluded that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (Tr. 17-20)

11

The ALJ found that, although Plaintiff's "medically determinable impairment could reasonably be expected to cause the alleged symptoms, her statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence. . .." (Tr. 21)  The ALJ explained that Plaintiff's "largely conservative treatment for her condition, including pain medication prescribed by her primary care provider and hot and cold presses, but no invasive surgical procedures" and unremarkable physical examinations undermined her subjective complaints of pain.  (Tr. 21-22)  In regard to Plaintiff's mental impairments, the ALJ acknowledged that Plaintiff "has suffered from depression for much of her adult life," but noted she received no "formal mental health treatment, with only prescriptions for psychiatric medication from her primary care provider" and her treating providers regularly observed that she was well-groomed. (Tr. 21)

The ALJ determined that Plaintiff had the residual functional capacity (RFC) to perform sedentary work with the following limitations:

> [S]he can occasionally bilaterally reach overhead and in all other directions. The claimant can occasionally finger and handle with both hands. She can never crawl or climb ladders, ropes, or scaffolds. The claimant can never work at unprotected heights or around moving mechanical parts or vibration.

(Tr. 20)  Based on the vocational expert's testimony, the ALJ determined that the Plaintiff was capable of performing her past relevant work as an "administrative social worker."[4]  (Tr. 25-26) The ALJ therefore concluded that Plaintiff was not disabled.  (Tr. 26)

**V. Discussion**

---

[4] At the hearing, the vocational expert classified Plaintiff's past work as "administrator, social welfare, DOT code 195.117-010."  (Tr. 64)  In his decision, the ALJ referred to Plaintiff's past position as "social worker" and "administrative social worker," but cited the same DOT code as the vocational expert.  (Tr. 25-26)

Plaintiff claims the ALJ erred in:  (1) failing to find that her anxiety, depression, and PTSD were severe impairments; and (2) determining her RFC because substantial evidence did not support the finding that she was capable of occasional handling and fingering.  [ECF No. 19]  In response, Defendant argues that substantial evidence in the record as a whole supported the ALJ's findings as to the severity of Plaintiff's mental impairments and the RFC determination.  [ECF No. 24]

A.  Standard for Judicial Review

A court must affirm an ALJ's decision if it is supported by substantial evidence. 42 U.S.C. § 405(g). "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion." Combs v. Berryhill, 878 F.3d 642, 646 (8th Cir. 2017).  In determining whether the evidence is substantial, a court considers evidence that both supports and detracts from the Commissioner's decision. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  However, "as long as substantial evidence in the record supports the Commissioner's decision, [the Court] may not reverse it because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently." Cline v. Colvin, 771 F.3d 1098, 1102 (8th Cir. 2014).

A court "do[es] not reweigh the evidence presented to the ALJ and [it] defer[s] to the ALJ's determinations regarding the credibility of testimony, as long as those determinations are supported by good reason and substantial evidence." Renstrom v. Astrue, 680 F.3d 1057, 1064 (8th Cir. 2012).  "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." Partee v. Astrue, 638 F.3d 860, 863 (8th Cir. 2011).

B.  Severity

13

Plaintiff argues that the ALJ erred at step two of the sequential evaluation when he failed to find that her anxiety, depression, and PTSD were severe impairments.  Defendant counters that "substantial evidence supports the ALJ's decision that Plaintiff did not meet her burden to prove she had a severe mental impairment or combination of impairments."

In determining the severity of a claimant's mental impairments at step two of the sequential evaluation, the ALJ must use the "special technique" described in 20 C.F.R. § 404.1520a.[5]  The ALJ first "evaluate[s] [the claimant's] pertinent symptoms, signs, and laboratory findings to determine whether [the claimant has] a medically determinable mental impairment(s)." 20 C.F.R. § 404.1520a(b)(1).  The ALJ "must then rate the degree of functional limitation resulting from the impairment(s)" in four broad functional areas:  (1) understand, remember, and apply information; (2) interact with others; (3) concentrate, persist, maintain pace; and (4) adapt or manage oneself.  20 C.F.R. § 404.1520a(c)(3).  "If we rate the degrees of your limitation as 'none' or 'mild,' we will generally conclude that your impairment(s) is not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in your ability to do basic work activities[.]"  20 C.F.R. § 404.1520a(d)(1).

The ALJ performed the above analysis in this case, and his analysis was supported by substantial evidence.  (Tr. 18-19)  In regard to the functional area of understanding, remembering, or applying information, the ALJ found Plaintiff had no limitations.  (Tr. 18)  The ALJ reasoned

---

[5] The SSA recently amended the regulations at issue, effective January 17, 2017.  81 Fed. Reg. 66138-66167 (Sept. 26, 2016).  The SSA specified that the SSA would use the revised rules on and after their effective date, and that it expected federal courts to review decisions using the regulations in effect at the time of the final administrative decisions.  Id.; see also Beatty v. Saul, No. 2:18-CV-22 ACL, 2019 WL 4243087, at *5 (E.D. Mo. Sept. 6, 2019).  Because the ALJ issued his decision on May 4, 2019, he applied the revised regulations.

that Plaintiff did not allege any memory deficit and Dr. Sparks routinely assessed her with recent and remote memory.  As to the functional area of interacting with others, the ALJ determined that Plaintiff had only mild limitations because, although she reported that she was "often [] not able to attend social activities or even leave her house," she noted that "the restrictions on her social activities was primarily due to her pain, not due to mental impairments." (Tr. 19)  The ALJ also observed that, at the April 2017 pegboard assessment, the evaluator described Plaintiff as polite.

The ALJ found that Plaintiff had mild limitations in the third functional area of concentrating, persisting, and maintaining pace.  The ALJ explained that, while Plaintiff stated that her ability to pay attention varies, "she noted that her limited attention span hinged upon her pain level and was not caused by mental impairments." (Tr. 19)  The ALJ further noted that Dr. Sparks routinely assessed Plaintiff with a normal attention span and ability to concentrate.  Finally, in regard to the fourth functional area of adapting or managing oneself, the ALJ found that Plaintiff had mild limitations.  The ALJ acknowledged Plaintiff's claim that she had difficulty dealing with stress, but he reasoned that she was able to "perform a variety of activities of daily living, including cleaning, laundry, cooking, shopping, driving, and caring for her personal needs, albeit with some assistance from her family when she is in pain" and Dr. Sparks regularly observed Plaintiff "to be well groomed." (Tr. 19)

The medical opinion evidence supported the ALJ's assessment.  In his psychiatric evaluation, Dr. Harden screened Plaintiff's cognitive functioning and found "her to be fully oriented to person, place, and time." (Tr. 479)  Dr. Harden also noted that Plaintiff's concentration "was such that she was capable of quickly and correctly mentally reversing her own zip code" and her immediate and remote recall were likewise intact.  (Id.)  Plaintiff considered herself "capable of responsibly managing her own money, medications, health care and hygiene" and attributed

15

limitations in her ability to do household chores, shop, and drive to her "ongoing chronic physical pain." (Id.)

Additionally, the state agency psychological consultant reviewed Plaintiff's medical records and opined that Plaintiff's "endorsed limitations are primarily due to physical impairments." (Tr. 107)  He found that Plaintiff had:  no limitations in activities of daily living; mild limitations in social functioning; and mild difficulties in maintaining concentration, persistence, or pace.  (Id.)

Moreover, even assuming *arguendo* that the ALJ erred in finding Plaintiff's mental impairments non-severe at step two, that error does not require remand because it was harmless. An ALJ's error at step two in failing to find a particular impairment severe does not require reversal where the ALJ finds other severe impairments and considers all of the claimant's impairments, severe and non-severe, in the subsequent analysis.  See Cornick v. Berryhill, No. 4:17-CV-1265 SPM, 2018 WL 4383300, at *3-4 (E.D. Mo. Sept. 14, 2018); Spainhour v. Astrue, No. 11–1056–SSA–CV–W–MJW, 2012 WL 5362232, at *3 (W.D. Mo. Oct. 30, 2012); Givans v. Astrue, No. 4:10–CV–417–CDP, 2012 WL 1060123, at *17 (E.D. Mo. Mar. 29, 2012).  See also 20 C.F.R. § 404.1545(a)(2).

Plaintiff argues that, in finding that Plaintiff's mental impairments were non-severe, the ALJ failed to consider her mental impairments in combination with her chronic pain.[6]  However,

---

[6] In support of her argument, Plaintiff cites Pratt v. Sullivan, 956 F.2d 830 (8th Cir. 1992).  In Pratt, the Eighth Circuit held that the ALJ committed reversible error when he failed to consider the effects of the plaintiff's mental impairment "in combination with the effects of [her] physical impairments on [her] residual functional capacity.  Id. at 835.  Pratt is inapposite because, in that case, the ALJ did not perform the analysis required by the regulations and concluded that the plaintiff did not have a medically determinable mental impairment.

the ALJ discussed Plaintiff's mental and physical symptoms, as well as the effect of Plaintiff's chronic pain on her mental health, throughout his decision.

In assessing Plaintiff's RFC, the ALJ discussed Plaintiff's testimony, medical records, and the opinion evidence related to her mental impairments.  The ALJ credited the state agency psychological consultant's finding of mild functional limitations and noted that Dr. Harden's mental status examination of Plaintiff was within normal limits.  (Tr. 23)   The ALJ also noted that, although Plaintiff received prescriptions for anti-depressants and anti-anxiety medications from her primary care physician, she received no specialized treatment for her mental health issues.  The fact that Plaintiff received only conservative treatment from her primary care physician and did not seek care from a psychiatrist, despite Dr. Harden's recommendation to do so, supported the ALJ's finding that her mental impairments were not severe.  See, e.g., Thomas v. Berryhill, 698 Fed App'x 323, 323–34 (8th Cir. 2017) (per curiam) (depression was not a severe impairment where the record contained scant evidence of mental health treatment, therapy progress notes showed no symptoms that would interfere with basic work activities, and the claimant's activities of daily living suggested no more than minimal impact from depression); Kirby v. Astrue, 500 F.3d 705, 708–09 (8th Cir. 2007) (claimant's mental impairment was not severe, in part, because the claimant received no formal treatment by a psychiatrist, psychologist, or other mental health professional over any long-term basis); Page v. Astrue, 484 F.3d 1040, 1044 (8th Cir. 2007) (same).

Finally, Plaintiff contends that the ALJ failed to properly consider the effects of Plaintiff's mental impairments in determining that she was capable of performing her past relevant work as a social welfare administrator.  The Eighth Circuit has held that the ALJ must "fully investigate and make explicit findings as to the physical and mental demands of a claimant's past relevant

work and to compare that with what the claimant herself is capable of doing before he determines that she is able to perform past relevant work." Nishke v. Astrue, 878 F.Supp.2d 958, 988 (E.D. Mo. 2012) (quoting Minick v. Sec. of Health & Human Serv., 887 F.2d 864, 866 (8th Cir. 1989)). An ALJ may discharge this duty by referring to specific job descriptions in the Dictionary of Occupational Titles and by relying on the testimony of a vocational expert. Wagner v. Astrue, 499 F.3d 842, 853 (8th Cir. 2007); Pfitzner v. Apfel, 169 F.3d 566, 569 (8th Cir. 1999).

Plaintiff testified that she previously worked as the executive director of a social welfare organization, where she wrote grants, completed "task assessments for individuals with disabilities," regularly reviewed "consumers' files," attended meetings, and communicated with other agencies. (Tr. 37)  The ALJ also elicited testimony from a vocational expert and presented a hypothetical question that fully described Plaintiff's RFC.  In response, the vocational expert testified that such an individual would remain able to perform Plaintiff's past work.  The Court therefore finds that the ALJ sufficiently considered the mental demands of Plaintiff's past work.

Based on Plaintiff's medical records, containing consistently normal mental status examinations, and the medical opinion evidence, the Court finds that substantial evidence supported the ALJ's evaluation of Plaintiff's mental functioning.  The ALJ did not err in finding that Plaintiff's mental impairments were non-severe.

3.  RFC

Plaintiff claims that substantial evidence did not support the ALJ's determination that Plaintiff had the RFC to perform sedentary work.  [ECF No. 19]  More specifically, Plaintiff argues that the ALJ erred in finding that she was able to occasionally finger and handle with both hands. The Commissioner counters that substantial evidence supported the ALJ's RFC determination. [ECF No. 24]

RFC is defined as what a claimant can do in a work setting despite his or her limitations and includes an assessment of physical abilities and mental impairments. 20 C.F.R. § 404.1545(a). The ALJ must determine a claimant RFC based on all relevant evidence, including medical records, observations of treating physicians and the claimant's own descriptions of her limitations. Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2001).  Although the ALJ bears the primary responsibility for assessing a claimant's RFC based on all relevant evidence, "a claimant's residual functional capacity is a medical question." Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001).  As such, although the ALJ is not limited to considering medical evidence, "some medical evidence 'must support the determination of the claimant's residual functional capacity, and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001).  A Court will uphold an ALJ's RFC determination if it is supported by substantial evidence in the record.  See Cox v. Barnhart, 471 F.3d 902, 907 (8th Cir. 2006).

Plaintiff's medical records reveal that she reported decreased grip strength and sensation and/or numbness in her hands to Dr. Sparks in May and December 2015, March and July 2016, and July and October 2017.  Nevertheless, in his physical examinations, Dr. Sparks consistently recorded normal sensation, coordination, and deep tendon reflexes in her upper extremities.  In the MSS completed in July 2016, Dr. Sparks opined that Plaintiff could frequently perform fine manipulation with both hands and occasionally perform gross manipulation with both hands.

Dr. Bondurant performed a neurological consultative examination for Plaintiff in February 2016 and observed that, despite initial giveaway weakness that cleared with encouragement, Plaintiff had full strength in the upper extremities.  She also had largely normal sensation, except some attenuation of the third to fifth fingers on her left hand and some paresthesia with prolonged

19

flexion of the wrists.  Although Dr. Bondurant suggested electrophysiologic studies of the upper extremities, the record does not contain documentation of such testing.

In April 2017, Plaintiff underwent the Purdue Pegboard test.  Plaintiff performed significantly below average for certain occupational areas, and she was unable to complete the test due to pain.  Based on her observations and Plaintiff's test results, Ms. Patterson, the consultative examiner who administered the test, opined that Plaintiff would not be able to perform a job requiring the use of her hands.

In determining Plaintiff's RFC, the ALJ reviewed Plaintiff's medical records and the medical opinion evidence.  Citing, among other evidence, Dr. Sparks' unremarkable longitudinal physical examinations and Plaintiff's "limited and conservative treatment," the ALJ determined that she had the RFC to perform sedentary work occasional bilateral fingering, handling, and overhead reaching.  (Tr. 25)

Plaintiff argues the ALJ erred in failing to include in the RFC greater limitations on fingering and handling.  However, a claimant bears the burden of proving her limitations.  Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004).  Here, Plaintiff did not prove that her hands were impaired to the extent that it precluded sedentary work.  To the contrary, Plaintiff's routine physical examinations were unremarkable and the only medical opinion provided by a treating source stated that she was capable of frequent fine manipulation and occasional gross manipulation.  "If substantial evidence supports the Commissioner's conclusions, this court does not reverse even if it would reach a different conclusion, or merely because substantial evidence also supports the contrary outcome."  Travis v. Astrue, 477 F.3d 1037, 1040 (8th Cir. 2007).

Furthermore, the ALJ accommodated Plaintiff's hand impairment by limiting her to only occasional handling, fingering, and overhead reaching.  In fact, the ALJ adopted limitations more

restrictive than those identified by Dr. Sparks, who found that Plaintiff was capable of frequently performing fine manipulation.  The Court finds that the medical evidence does not support limitations more extensive than those articulated in the RFC.  "The mere fact that working may cause pain or discomfort does not mandate a finding of disability[.]" Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000).

Plaintiff also argues that the ALJ failed to properly weigh Ms. Patterson's opinion.  In determining a claimant's RFC, the ALJ must consider the medical opinion evidence of record together with the other relevant evidence.  20 C.F.R. § 404.1527(b).  The ALJ must "give good reasons" to explain the weight given to every medical opinion of record, regardless of its source.  See 20 C.F.R. §§ 404.1527(c), (e)(2)(ii), 416.927(c), (e)(2)(ii).   All medical opinions, whether by treating or consultative examiners, are weighed based on (1) whether the provider examined the claimant; (2) whether the provider is a treating source; (3) length of treatment relationship and frequency of examination, including nature and extent of the treatment relationship; (4) supportability of opinion with medical signs, laboratory findings, and explanations; (5) consistency with the record as a whole; (6) specialization; and (7) other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c).

The ALJ assigned only "limited weight" to Ms. Patterson's opinion because:  (1) she evaluated Plaintiff on a single occasion; (2) she specialized in education and counselling psychology and was therefore "not qualified to render such clinical observations" about Plaintiff's physical functioning; and (3) her opinion was inconsistent with Dr. Bondurant's clinical observations.  The Court finds the ALJ provided "good reasons" for the weight he accorded Ms. Patterson's opinion.

21

The record contained substantial evidence to support the ALJ's RFC assessment, which properly accounted for the impairments to her hands and arms.  Although Plaintiff cites evidence that might support a contrary decision, substantial evidence supported the ALJ's RFC determination and, as such, this Court is required to affirm.

**VI. Conclusion**

For the reasons discussed above, the Court finds that substantial evidence in the record as a whole supports the Commissioner's decision that Plaintiff is not disabled.  Accordingly,

**IT IS HEREBY ORDERED** that the final decision of the Commissioner denying Social Security benefits to Plaintiff is **AFFIRMED**.

A separate judgment in accordance with this Memorandum and Order is entered this date.

PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE

Dated this 24th day of April, 2020